1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

SEAN BOOKOUT, et al.,⠀⠀⠀⠀⠀⠀) No. CV 13-2710-SH
⠀⠀⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀) MEMORANDUM AND ORDER
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
BELLFLOWER UNIFIED SCHOOL )
DISTRICT, et al.,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀Defendants.⠀)
_____)

⠀⠀⠀⠀⠀This case arises from a dispute regarding the provision of educational services to the eight and half year-old son of Plaintiffs and Cross-Defendants Sean and Malika Bookout ("Student"), a child eligible for special education services on the basis of autism pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1401, et seq. ("IDEA"). On April 18, 2013, Student filed the instant Complaint for Statutory Attorney Fees, in connection with the Decision rendered by Administrative Law Judge Alexa Hohensee ("ALJ") of the Office of Administrative Hearings ("OAH") on March 13, 2013. On May 16, 2013, Bellflower Unified School District ("District") filed a Counterclaim against Student, appealing the OAH decision and seeking attorneys' fees and costs. On February 1, 2014, the District filed its Reply.

In a minute order dated August 6, 2013, the Magistrate Judge set a briefing schedule regarding the appeal of the OAH decision, and deferred the issue of attorneys' fees and costs dependent on whether the OAH decision is affirmed in whole or in part. For reasons stated below, the OAH decision is affirmed.

## I. <u>BACKGROUND AND PROCEEDINGS</u>[1]

Student is an eight and a half year-old child eligible for special education services on the basis of autism. [4AR:68:570.] Per the terms of a prior agreement, for the 2010-2011 school year Student was placed in a general education kindergarten at Lindstrom Elementary School on a shortened schedule. [2AR:29:251.] It was also agreed that Student would receive forty hours per week of direct one-on-one applied behavior analysis ("ABA") support at home and at school and twenty hours per month of ABA consultation/supervision provided by a non-public agency ("NPA"), the Center for Autism and Related Disorders ("CARD").   [2AR:28:248 and 2AR:29:250.]

Student's general education teacher at Lindstrom was Ms. Evelyn Albert.  Student was the first fully included autistic child that had ever been placed in one of her classrooms, and she had never had an autistic child mainstreamed into one of her classes for even part of the school day.  In seventeen years with the District, she had received no training on autism.  Lindstrom's principal at the time, Beverly Swanson, testified that she was unaware the Ms. Albert had never had a fully included autistic child in one of her classes and that because educating a fully included autistic child is "very labor intensive," such children are placed on something of a rotating basis to evenly distribute the burden of educating them; they are not placed on the basis of the teacher's training and experience, or even the teacher's attitude towards having such a child in his or her

---

[1] The following summary of the factual background derives from Student's Factual Background in his Opposition at pp. 2-6, and from District's Statement of the Facts on pp. 3-10 of its Opening Brief.  The court has reviewed the record and finds the summary to be substantially accurate.  Where necessary, the court has edited or supplemented the summary.

classroom. [3AT:28:18-20, 29:8-10; 4AT:184:22-185:14.]

During the 2011-2012 school year, Student received ABA therapy at home and in school supervised by Ms. Marina Bulkin, MA, BCBA, of CARD.  The CARD program addressed Student's maladaptive behaviors, communication deficits, self-direction, socialization, safety awareness and toileting skills. [5AR:103:791-792; 3AR:46:337-357, 62:545-551, 45:315-336.]

District Full Inclusion Specialist Janie Nilsson was responsible for providing the support Student required in order to be fully included in a general education classroom and to track his progress toward his IEP goals.

During the 2011-2012 school year, Student had loud verbal outbursts, threw materials and himself onto the floor, but his hands and knees, jumped out of his seat and ran around the classroom, kicked his legs, and on more than one occasion threw his head back violently while on the floor, slamming it into the floor of the classroom and outside the classroom on the asphalt.  Student's outbursts occurred daily and were disruptive to Ms. Albert's class.   As a result, Student's CARD aides often took him out of the classroom for up to fifteen minutes to calm him before returning to the classroom. [3AT:10:21-25; 12:16-25; 40:22-41:3; 254:17-255:2.]

On March 20, 2012, while supported by a substitute CARD aide, Student bit Ms. Albert's ankle. [3AR:59:540.] Subsequently, on April 19, 2012, Student bit another student but, according to Ms. Nilsson, "it wasn't hard, and didn't break the skin." [3AR:65:565.] On May 2, 2012, "[Student] bit another student on the web of her hand ... caus[ing] an injury of approximately the size of a dime." [2AR:31:257.] The incident occurred when the child who was bitten tried to take a hula hoop away from Student. [2AR:33:259.]

Student struggled to socialize with other students when opportunities were presented both in the classroom setting and on the playground during recess.  Other students would try to socialize with Student, and he would respond only when prompted by an aide.  At the end of the school year, Ms. Nilsson and a CARD aide facilitated a

1    three-student play activity during morning and recess that met with moderate success.

2    [3AT:13:3-12; 257:209; 291:3-21.]

3        Ms. Albert testified that Student did not respond well to instruction in the general

4    education classroom setting. [3AT:11:7-25.] Student was academically advanced in some

5    areas and was eventually provided a First Grade level workbook. [3AT:288:240289:11;

6    4AR:74:632-637.] Ms. Nilsson explained Student's advanced academic progress in

7    certain areas was because it was Student's second year in kindergarten. [2AR:29:251.]

8    Ms. Albert tried individual instruction with Student, trying to engage Student individually

9    multiple times a week.  Over the course of the year, there was no measurable progress.

10   [3AT:11:1-10; 21:25-22:15.]

11       Student's annual IEP meeting was convened the day following the biting incident,

12   May 3, 2012. [4AR:68:570.] Based on input from the classroom teacher, Ms. Albert, Ms.

13   Nilsson reported that "[Student] currently is able to read twenty-seven high frequency

14   words in 15 minutes.  He is also able to read thirty-one first grade Dolch phrases, as

15   assessed over four days with a total time being 43 minutes." [3AR:68:573.] Ms. Albert

16   further reported that "[Student] is able to add numbers with sums to ten without

17   manipulatives or picture cues." [4AR:68:574.] Nevertheless, the District recommended

18   Student's "immediate placement into the SDC [special day class] M-M [mild to

19   moderate] program. [4AR: 68:584.]

20       At the hearing, the District admitted that it did not offer Student a specific M-M

21   SDC. [3AR:174:4-14.] The District did recommend the continuation of the forty hour per

22   week "home/school" ABA program and twenty hours per month of "consultation

23   supervision" provided by an NPA. [4AR:60:579.] The District also recommended

24   accommodations and modifications which called for the use of prompts in "all

25   instructional settings," [4AR:68:583.] The District also proposed that Student be

26   mainstreamed 18% of the school day, with a specific provision that "student will not

27   participate in the general education environment for academics."  [4AR:68:582.]

28       Another IEP meeting was convened on May 11, 2012, the stated purpose of which

1   was to discuss a "change of placement." [2AR:34:261.] At this meeting, the District did
2   not offer Student an SDC placement, as previously recommended, but rather a "general
3   education classroom at Washington Elementary School with the continued one-on-one
4   aide support he has in place now ..." [2AR:35:265.]

5       On May 16, 2012, Student's father indicated the Parents' agreement to the May 3,
6   2012, IEP with the exception of the proposed placement in an SDC. [4AR:68:586.]

7       On June 20, 2012, Student's kindergarten Student Achievement Report, signed by
8   Ms. Albert, was issued. [4AR:76:639.] Although the report indicates that Student's
9   "grades for subjects are based on goals and objectives as stated on [Student's] IEP," he
10  had met grade level standards in all areas marked except for "listening and speaking" and
11  mathematical reason." [4AR:76:639.] At the hearing, Ms. Albert testified that Student's
12  grades were based upon "both" his IEP goals and objectives and general education
13  standards.  Ms. Albert further indicated on the report card that Student "has made small
14  steps in adjusting to a mainstream classroom" but, at the hearing, acknowledged that her
15  opinion that Student had made little progress was based upon her expectations for general
16  education students, not a fully included child with autism.

17      On May 24, 2012, Bellflower Unified School District ("District") filed a request
18  for due process hearing, alleging that the May 3, 2012 IEP offered Student a free
19  appropriate public education ("FAPE") in the least restrictive environment ("LRE").  On
20  June 13, 2012, Student filed a due process hearing request alleging a failure to offer
21  Student a FAPE in the LRE, as well as procedural violations. [1AR:1:1-15; 1AR: 3:25-
22  29.] The hearing before the Office of Administrative Hearings took place on January 14
23  through 17, 2013. On March 13, 2013, the OAH issued its Decision in the matter.

24      On or about June 5, 2012, Student chased and scratched another student with a
25  stick while on the playground. [2AR:39:272.] The incident was witnessed and reported to
26  principal Swanson by the mother of the student who was bitten on May 2, 2012–this
27  parent attended recess daily after her child was bitten.  Following the incident, Ms.
28  Swanson asserted that the CARD aide working with Student lied about the events and her

1   actions regarding the incident, first saying that she did not know that Student had a stick,

2   and then writing a statement in which she stated that she had taken a 4-inch long stick

3   away from Student.  As a result, Ms. Swanson communicated to Ms. Bulkin that she did

4   not trust the CARD aide and lacked faith in CARD as an agency.  Ms. Bulkin said she

5   wanted to work together to help Student, but Ms. Swanson replied that she did not know

6   how they could work together when there is no trust. [2AR:39:272; 2AR38:271.]

7       Pursuant to the "stay put" provision of federal and state educational law, in

8   September of 2012, Student began attending, with the support of his CARD program, a

9   first grade general education classroom at Lindstrom Elementary taught by Lara

10  Cummins.  At the time, Ms. Cummins had been employed by the District for eighteen

11  years and Student was also the first fully included autistic child she had had in one of her

12  classrooms.

13      In September 2012, the District performed a confidential FAA Assessment.

14  School psychologist Stephanie Holleran, Psy.D, completed the FAA on November 13,2

15  012. [2AR:40:273, 41:274.] An FAA is an analysis of antecedents, targets, and

16  consequences of behaviors, and when physically aggressive behavior is exhibited, an

17  FAA must be performed.  The October 2012 FAA report concluded as follows: "It is this

18  examiner's opinion that [Student] would be better served and less frustrated if provided

19  instruction within a smaller classroom environment suited to his unique needs, support

20  and pacing, and with appropriate mainstreaming opportunities." [2AR:41:292.]

21      In her November 2012 progress report, District Inclusion Specialist Janie Nilsson

22  reported that Student was making progress toward all of his classroom goals, including

23  "good progress" toward his reading goal and "substantial progress" toward his math goal.

24  [5AR:101:782-783.] Ms. Nilsson testified that in Ms. Cummins' class Student's self-

25  injurious behaviors decreased.  She further testified, on January 15, 2013, that there had

26  been no further incidents of Student biting peers or adults since the one which took place

27  on May 2, 2012.

28      CARD Supervisor Marina Bulkin testified that Student's tantruming, aggression,

self-stimulatory behaviors, and noncompliance had all decreased as a result of the ABA program implemented by CARD.  Ms. Bulkin further testified that Student's use of functional communication had increased, as had his imitation skills which resulted in Student learning "a number of appropriate skills in that period of time, which has made him more successful in the first grade environment."

## II.  ISSUES ON APPEAL

The issues asserted by the District on appeal of the OAH decision are as follows:

a.   Whether the ALJ erred by finding that the District failed to offer Student with a free appropriate public education pursuant to the May 3, 2012 IEP, and whether the ALJ committed a procedural violation by failing to offer Student a specific placement at the May 3, 2012, and May 11, 2012 IEP meetings;

b.   Whether the ALJ erred by finding that whether the District was required to contract with nonpublic agency ("NPA") serving Student at the time of the IEP to provide the behavioral services specified in the IEP was not properly before her, and refusing to issue an advisory opinion; and

c.   Whether the ALJ erred by ordering compensatory services to Student;

d.   Who is the prevailing party entitled to attorneys' fees and costs?

## III.  STANDARD OF REVIEW

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2).  In any action brought under § 1415(i)(2), the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate.  20 U.S.C. §§  1415(i)(2)(C)(i)-(iii).

This modified *de novo* standard requires that "due weight" be given to the administrative proceedings.  Bd. of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).  The amount of deference so accorded is subject to the court's discretion.  Gregory K. v. Longview Sch.

1   Dist., 811 F.2d 1307, 1311 (9th Cir. 1987).  In making that determination, the

2   thoroughness of the hearing officer's findings should be considered, with the degree of

3   deference increased where said findings are "thorough and careful."  Capistrano Unified

4   Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995)(citing Union Sch. Dist. v.

5   Smith, 15 F.3d 1519, 1524 (9th Cir. 1994)).  Where a hearing officer's decision contains

6   some findings that are "thorough and careful," and others that are not, the court can give

7   deference to the thorough and careful findings and yet review other findings

8   independently.  See R.B., ex rel. F.B. v. Napa Valley Unified School Dist., 496 F.3d 932,

9   943 (9th Cir. 2007)("[W]e accord particular deference to the [hearing officer's] 'thorough

10  and careful' findings ... although we independently review the testimony in the record

11  that [she] failed to consider.").

12      Complete de novo review is inappropriate.  Amanda J. v. Clark County Sch. Dist.,

13  267 F.3d 877, 887 (9th Cir. 2001).  Instead, the district court must make an independent

14  judgment based on a preponderance of the evidence and giving due weight to the hearing

15  officer's determination.  Capistrano, 59 F.3d at 892.  The preponderance of the evidence

16  standard "is by no means an invitation to the courts to substitute their own notions of

17  sound educational policy for those of the school authorities which they review." Hendrick

18  Hudson, 458 U.S. at 206.  Rather, as indicated above, the court must give "due weight" to

19  the administrative proceedings.  Id.  After making the requisite independent assessment

20  under the constraints outlined above, the court is free to accept or reject the hearing

21  officer's findings in whole or in part.  Ojai Unified Sch. Dist., 4 F.3d at 1472–73.   The

22  burden in this proceeding is on the District, as it is the party challenging the

23  administrative ruling.  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62, 126 S. Ct. 528,

24  163 L. Ed. 2d 387 (2005); Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d 1493, 1498 (9th Cir.

25  1996) ("As the party challenging the administrative ruling, the School District ... had the

26  burden of proof in district court.").

27  \\\

28                          **IV.  IDEA**

1   The IDEA requires that all states receiving federal funds for education must
2   provide disabled school children with a Free Appropriate Public Education ("FAPE"). 20
3   U.S.C. § 1412(a)(1)(A). The FAPE, consisting of special education and related services
4   provided at no cost to the child's parent or guardian, must meet state educational
5   standards and be tailored to the child's unique needs through development of an
6   Individualized Education Program ("IEP"). 20 U.S.C. § 1401(9).  The IEP is a written
7   statement for each child that is developed and revised each year by a team comprised of
8   the child's parents, teachers and other specialists.  20 U.S.C. §§ 1401(14) and
9   1414(d)(1)(B).  The IEP must be reasonably calculated to provide the student with some
10  educational benefit, although the IDEA does not require school districts to provide
11  special education students with the best education available, or provide instruction
12  services that maximize a student's abilities.  Hendrick Hudson, 458 U.S. at 198–200.
13  Rather, school districts must only provide a "basic floor of opportunity" and make
14  available, on an individualized basis, such specialized instructional and related services
15  necessary to provide the requisite educational benefit.  Id. at 201.

16      "[A] state must comply both procedurally and substantively with the IDEA." N.B.
17  v. Hellgate Elementary School Dist., 541 F.3d 1202, 1207 (9th Cir. 2008)(quoting M.L.
18  v. Fed. Way Sch. Dist., 394 F.3d 634, 644 (9th Cir. 2005)).  "State standards that are not
19  inconsistent with federal standards [under the IDEA] are also enforceable in federal
20  court."  Id. at 1208 (quoting W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23, 960
21  F.2d 1479, 1483 (9th Cir. 1992)).

22      A basic three-step analysis applies in determining whether a violation of the IDEA
23  denies a qualified disabled student a FAPE.

24      First, the court asks whether the school district violated the IDEA, either
25  "procedurally" or "substantively."  Rowley, 458 U.S. at 206–07.  A school district may
26  violate the IDEA's statutory or regulatory procedures in creating or implementing (or
27  failing to create or implement) an IEP.  Id.  Or a school district may violate the IDEA
28  substantively by offering an IEP that is not reasonably calculated to enable the child to

9

receive educational benefit.  Id.  The school district must provide the student with a FAPE that is "appropriately designed and implemented so as to convey" to the student a "meaningful" benefit.  J.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 433 (9th Cir. 2010)(quoting Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999)).

Second, if the court finds a violation of the IDEA's procedures, the court then addresses whether that violation denied that student a FAPE—for not all procedural violations are actionable.  See, e.g., Capistrano Unified Sch. Dist., 556 F.3d at 909; 20 U.S.C. § 1415(f)(3)(E)(ii).[2]  The procedural violation must result in the "loss of [an] educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process."  Capistrano Unified Sch. Dist., 556 F.3d at 909 (quoting W.G. v. Bd. of Trs. of Target Range Sch. Dist., 960 F.2d 1479, 1484 (9th Cir. 1992)). That is, "where a procedural violation does not result in a lost educational opportunity for the student, the violation is 'harmless error' because it does not deny the student a FAPE."  Napa Valley Unified Sch. Dist., 496 F.3d at 938 n.4 (citation omitted).

The third stage is the remedy—and this stage itself includes several steps.  If an IDEA violation results in denial of a FAPE, a district court has discretion to "grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  Such relief could include compensatory education services as appropriate equitable relief.  See 20 U.S.C. §1415(i)(2)(B)(iii)("shall grant such relief as the court determines appropriate"); Park, ex rel. Park v. Anaheim Union High School Dist., 464 F.3d 1025, 1033 (9th Cir. 2006)(awarding compensatory services in the form of training for student's special

_____

[2]  Section 1415(f)(3)(E)(ii) provides:
In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—
    (I) impeded the child's right to a free appropriate public education;
    (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
    (III) caused a deprivation of educational benefits.

education teacher that was designed to compensate student for the district's violations by better training his teachers to meet his particular needs). Cf. Parents of Student W. v. Puyallup Sch. Dist., 31 F.3d 1489, 1496–97 (9th Cir.1994)(finding that compensatory education services are an appropriate remedy but declining to award such services based on analysis of equitable factors including fact that parents had declined to enroll student in summer programs available to student). "Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the [Individuals with Disabilities Education Act]." Parents of Student W., 31 F.3d at 1497. The courts have discretion on how to craft the relief and "[t]here is no obligation to provide a day-for-day compensation for time missed." Id.

## V.  DISCUSSION

**A.   A PREPONDERANCE OF THE EVIDENCE SUPPORT'S THE ALJ'S THOROUGH AND CAREFUL FINDING THAT DISTRICT FAILED TO COMPLY WITH IDEA PROCEDURAL REQUIREMENTS AND THAT STUDENT WAS DENIED AN FAPE**

### 1.    IEP Procedural Requirements:

District contends that the ALJ's finding that the May 3, 2012 IEP met some, but not all, of the procedural requirements under the IDEA, and is not supported by case law. District further asserts that the ALJ's finding relies on incorrect characterizations of testimony and improper interpretation of the discussion of the District's Special Day Class ("SDC") programs during the IEP meeting. [Dist. Opening Brief 11-13.] As discussed below, the applicable Ninth Circuit law supports the ALJ's finding, as does the evidence presented at the hearing.

#### a.    ALJ Findings:

In pertinent part, the ALJ found as follows:

District failed to meet its burden to prove that the IEP was conducted in procedural compliance with the IDEA, as the IEP met some, but not all, of the attendance and written requirements.

[ . . . ]

. . . although the May 3, 2012 IEP lists the frequency and duration of ABA services offered, it does not specify where those services were to be performed, or for what part of the school day. The IEP states that the location of the services will be "home/school," failing to allocate the proportion of services that would be provided in the school setting or the home setting. It is impossible to determine from the IEP document whether Student was offered a full-day school program with supplemental home services, or a 40-hour home program, or something in between. The "services" page of the IEP does not offer any clarification. The accommodations/modifications section merely states that Student was offered "1-1ABA support, modified day" and that at the time of the IEP was attending kindergarten for three hours and fifteen minutes each day. This statement does not address whether the same period of attendance, or more, was offered for the upcoming year during which Student would be attending first grade. This lack of clarity extends to the IEP's statement that Student was offered 18 percent of his "time" in general education. Because the length of Student's school day is unclear, a statement that any portion of that school day will be spent in general education cannot fulfill the requirement that the IEP include an explanation of the extent to which the child will participate with nondisabled children in a regular class or other activities. District's failure to clearly delineate the location in which Student would receive his ABA services, or to provide a meaningful statement of the length of Student's school day or of the amount of time Student would be educated with typically developing peers, constitutes a violation of the written requirements for an IEP. (Factual Findings 1-45 and Legal Conclusions 1, 4-6, 9.)

[AR5:105:817-818.] With regard to whether the District's offer of educational placement in the IEP was sufficiently specific as to location, the ALJ found as follows:

Although Parents participated [in the IEP team meeting], the evidence also established that District failed to make a specific placement offer. No specific

MM/SDC classroom was offered at the May 3, 2012 IEP team meeting, and available and appropriate MM/SDC classrooms within the District were not even described or discussed.  Ms. Albert, Ms. Nilsson, Ms. Roberts, Ms. Acosta, and Mother testified uniformly and without equivocation that no specific classroom or school location was offered or discussed at the IEP meeting on May 3, 2012. District team members perceived that Parents would not accept an SDC placement, and therefore chose not to discuss or offer any specific SDC classroom to meet Student's unique needs.  However, per *Anchorage*, District's duty to offer placement was not contingent upon Parents' cooperation, and per *Union*, Parents' perceived unwillingness to accept an SDC placement did not excuse District's obligation to formally offer an appropriate placement. (Factual Findings 1-45 and Legal Conclusions 1, 4-14).

District contends that the requirement that a "location" be identified in an offer of placement does [not] require that a specific school site be identified, characterizing the neighborhood school requirement of the IDEA as a mere proximity preference.  However, there is nothing discretionary in federal regulations that mandate that a school district "ensure" that a student's placement be "as close as possible" to the student's home, and that the student be educated in the school that he or she would attend if not disabled, unless the disability requires some other arrangement.  (See C.F. R. §§ 300.116(b)(3) and (c).)  *Union* requires that the procedural requirements of a placement offer be "enforced rigorously," and until and unless a school district designates a specific school site in its placement offer, the parent of a disabled student has no means of determining if the offer complies with federal requirements that their child be educated in his or her home school unless the disability requires otherwise.  District's failure to specify a specific school site in its May 3, 2012, IEP offer constituted a procedural violation of Student's rights as a matter of law.  (Factual Findings 1-45 and Legal Conclusions 1, 4-14, 21.)

[AR5:105:819.]

The ALJ continued, citing evidence that the MM/SDC classrooms throughout the district were not the same, and that not all were appropriate for Student.  The ALJ found that this disparity "fatally undermin[ed]" the District's contention that its offer of any MM/SDC location within the District was sufficient. [See AR5:105:819.]

### b.   Applicable Law:

IDEA contains specific procedural safeguards in connection with its guarantee of a FAPE.  See 20 U.S.C. § 1415(a).  The Supreme Court has explained the great importance of such procedural components of the IDEA:

> When the elaborate and highly specific procedural safeguards embodied in § 1415 [of the IDEA] are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid.

Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley, 458 U.S. 176, 205, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).

However, "[p]rocedural flaws do not automatically require a finding of a denial of a FAPE." W.G. v. Bd. of Trustees of Target Range Sch. Dist., 960 F.2d 1479, 1484 (9th Cir. 1992) (internal citations omitted), superseded by statute on other grounds, 20 U.S.C. § 1414(d)(1)(B).  Only procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE. Id.; L.M. v. Capistrano Unified School Dist., 556 F.3d 900, 910 (9th Cir. 2009)("a procedural violation may be harmless, and we must consider whether the procedural error either resulted in a loss of educational opportunity or significantly restricted parental participation.").  Therefore, the question here is whether the procedural violations "significantly restricted" Parents' participation in the IEP process.  See M.L. v. Federal Way School Dist., 394 F.3d 634, 653 (9th Cir. 2005).

California Code of Regulations, § 3042(a) states:

Specific educational placement means that unique combination of facilities, personnel, location or equipment necessary to provide instructional services to an individual with exceptional needs, as specified in the IEP, in any one or a combination of public, private, home and hospital, or residential settings.

The Ninth Circuit has held that one of the procedural violations that may constitute a denial of a FAPE is the failure of the District to make a "formal, specific" offer of placement. Union School Dist. v. Smith, 15 F.3d 1519, 1526 (9th Cir. 1994). Among other things, "a formal, specific offer from a school district will greatly assist parents in 'present[ing] complaints with respect to any matter relating to the . . . educational placement of the child.' 20 U.S.C. § 1415(b)(1)(E). For example, in this case, a formal offer . . . would have served several purposes. It would have alerted the [parents] to the need to consider seriously whether [the offered placement] was an appropriate placement under the IDEA . . ." Union, 15 F.3d at 1526.

### c.    Analysis:

The May 3, 2012 IEP in this case reflects that the District offered Student an "SDC M/M classroom within Bellflower USD." [4AR:68:582.] The page of that IEP entitled "Services," states: "District is offering special day class mild/moderate setting as [Student's] least restrictive environment. SDC M/M provides a free and appropriate public education at this time." [4AR:68:579.]

The record reflects that there were seven SDC classrooms in the District, of which five were for students with mild to moderate disabilities. Ms. Acosta and Ms. Roberts testified at the hearing that they did not think that all of the MM /SDC classes in the district would be appropriate for Student. [5AR:105:804-805.]  Ms. Roberts and Ms. Acosta further testified that there was no discussion of the specific SDC programs at the IEP meeting, therefore, neither of them shared their knowledge of the different SDC classrooms with the IEP team. [Id.]  While the District contends that the ALJ misconstrued the record by finding that there was no discussion of specific SDC

1   classrooms, it is clear from the record that an SDC placement in general was discussed,

2   without discussion of a specific classroom in which Student would be placed.  As a

3   result, the District's broad offer of placement did not provide Parents with sufficient

4   information to determine which SDC placements were inappropriate and which, if any

5   was appropriate.  See Glendale Unified School Dist. v. Almasi, 122 F. Supp. 2d 1093,

6   1107 (C. D. Cal. 2000)(holding that, where district offered multiple placement options,

7   an undue burden was placed on parents to eliminate potentially inappropriate placements,

8   and the offer of various classrooms did not comply with Union and denied Student a

9   FAPE.)  Furthermore, it is clear under Ninth Circuit law, that Parents' unwillingness to

10  consider an SDC did not relieve the District of its obligation to make a specific offer of

11  educational placement.  Anchorage School Dist. v. M.P., 689 F.3d 1047, 1055 (9th Cir.

12  2012).

13          Based on the foregoing, the ALJ's conclusion that the District's failure to identify

14  a specific MM/SDC classroom location in its offer, constituted the failure to offer a

15  specific educational placement as required under IDEA and 5 Cal. Code Regs.

16  § 3042(a), is supported by a preponderance of the record evidence.  The District's failure

17  to offer a specific SDC classroom placement "significantly restricted" the parents

18  participation in the IEP process because they were denied an expert evaluation and

19  recommendation of which particular classroom might have been appropriate, and had no

20  opportunity to discuss a specific placement option with the IEP team.  See  Union, 15

21  F.3d at 1526; M.L., 394 F.3d at 653; Glendale Unified, 122 F. Supp. 2d at 1107.  As a

22  matter of law, under Rowley, the District's placement offer did not provide a specific

23  classroom location in compliance with state regulations and the IDEA.[3]  Accordingly, the

24

25          [3]  The District relies solely on a Fifth and a Second Circuit case for the proposition
26  that there is no requirement under the IDEA that the IEP name a specific school location.
27  Where there are Ninth Circuit cases, such as Union and Smith that address and interpret
28  the required specificity under the IDEA of an offer of education placement, along with a
                                                                                    (continued...)

1    OAH decision is affirmed on this ground.

2        **2.    <u>Substantive Denial of a FAPE</u>:**

3        Next, the District contends that, "[t]he evidence presented at the hearing does not

4    support a finding that the District's offer of an SDC class was objectively unreasonable

5    thereby denying Student a FAPE under the IDEA." [Dist. Opening Brief at 14.] Review

6    of the administrative record reveals that the ALJ's decision is thorough and meticulous

7    on this issue and well-supported by applicable Ninth Circuit law.

8        **a.    ALJ Findings:**

9        The ALJ noted that, "although the May 3, 2012 IEP was reasonably calculated to

10   provide Student with some educational benefit in light of his unique needs, the offer of

11   placement was inconsistent with the IDEA because it was not in the LRE ["least

12   restrictive environment"] and did not provide for Student to attend the same school he

13   would attend if he was not disabled." [5AR:105:821.] Further, the ALJ found that

14   "District's proposal to change Student's placement to provide these services in an

15   _____

16        [3] (...continued)

17   state regulation mandating a specific location, those out of circuit authorities are
     inapposite.  <u>T.Y. v. New York City Dept. of Educ.</u>, 584 F.3d 412, 420 (2d Cir. 2009),

18   cited by the District, holds that an "IEP's failure to identify a specific school location will
     not constitute a *per se* procedural violation of the IDEA."  That holding is not

19   inconsistent with Ninth Circuit law holding that a procedural violation, such as the failure

20   to identify a specific location, may be harmless error if it does not "significantly restrict"
     the parents ability to participate in the IEP process. See <u>L.M. v. Capistrano Unified</u>

21   <u>School Dist.</u>, 556 F.3d at 910.  Here, as discussed above, the procedural error <u>did</u>

22   significantly restrict Parents' participation because they were not given adequate
     information from which to evaluate whether the offered placement was appropriate.  The

23   other case relied upon by the District, <u>White ex rel. White v. Ascension Parish School</u>

24   <u>Bd.</u>, 343 F.3d 373, 379 (5th Cir. 2003), involved whether the statutory provisions of
     IDEA "explicitly require parental participation in site selection."  <u>White</u>, 343 F.3d at 379.

25   Here, unlike in <u>White</u>, the issue is whether the District is required to notify parents in the

26   IEP of the site where offered services will be provided.  While the court in <u>White</u> found
     that parents are not entitled to "veto power" over site selection, Parents here were not

27   even informed of the specific site where educational services were to be provided.

28

1  MM/SDC setting, or at other than Student's home school, was unsupported by the
2  evidence." (actual Findings 1-45 and Legal Conclusions 1, 4-6, 24-27.)." [Id.]

3       In addition, the ALJ found that "District failed to meet its burden of establishing by
4  a preponderance of the evidence that the IEP offered Student placement 'as close as
5  possible to the child's home,' and 'in the school he or she would attend if nondisabled.'
6  (See 34 C.F.R. §§ 300.116(b)(3) and (c).)." [Id.]

7       The ALJ then applied the factors set forth in <u>Sacramento City Unified School Dist.</u>
8  <u>v. Rachel H.</u>, 14 F.3d 1398, 1404 (9th Cir. 1994) for determining compliance with
9  IDEA's mainstreaming requirement as set forth in 20 U.S.C. § 1412(a)(5)(A).  The
10 ALJ's analysis of each of the four <u>Rachel H.</u> factors includes a thorough discussion of
11 the evidence relied upon, with references to instances in which the evidence conflicts and
12 rationale for giving more weight to some evidence over other evidence.  Because the
13 ALJ's analysis of this issue is thorough and careful, the court gives deference to the
14 ALJ's findings in this regard.  The ALJ concluded as follows:

15       In conclusion, each of the four *Rachel H.* factors weighed in favor of Student's
16       placement in a general education setting at the time of the IEP.  Student had
17       obtained educational benefit, non-academic benefit, had an insufficiently adverse
18       impact on the teacher and students to warrant a change to a more restrictive setting,
19       and the cost of the full inclusion program was not prohibitive.  (Factual Findings 1-
20       45 and Legal Conclusions 1, 4-6, 24-27, 30-37.)

21

22       Finally, the ALJ noted that Student's placement as of the date of the OAH hearing
23 did not comply with the <u>Rachel H.</u> factors either.  Spending only three hours of a six and
24 one-half hour school day in general education, Student was missing lessons in science,
25 history, and computer skills, and missing reteaching and reinforcement in language arts
26 lessons during the afternoon class periods.  Student was isolated in the afternoons in the
27 most restrictive setting; a home ABA program in which he was deprived of opportunities
28 to learn and speak with peers, in the classroom, on the playground, and in P.E.  While

Ms. Bulkin felt it was easier to teach Student in the home because of the need for intense repetition, "the law requires Student to be taught in the least restrictive setting, not the easiest or most preferred setting." [5AR:105:825.] At the hearing, behaviorists and educators agreed that although Student needed to practice communication and socialization skills in the home setting prior to generalizing them to the school setting, Student needed to practice in the reciprocal school environment with other children. "Isolation in a home program was causing Student to fall further and further behind in acquiring peer-to-peer social and language skills essential to success in school." [Id.]

### b.    Applicable Law:

The IDEA, at 20 U.S.C. § 1412(a)(5)(A) provides:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

The Ninth Circuit has adopted a four-factor balancing test for determining whether the IDEA least restrictive environment requirement has been met. Sacramento City Unified Sch. Dist. v. Rachel H., 14 F.3d 1398, 1403 (9th Cir. 1994). The court balances the following four factors: (1) the educational benefits of placement full-time in a less restrictive class; (2) the non-academic benefits of such a placement; (3) the effect of the student on the teacher and children in the less restrictive class, and (4) the costs of mainstreaming the student. Id. at 1403.

### c.    Analysis:

As to the first <u>Rachel H.</u> factor--whether Student was receiving educational benefit from inclusion in a general education classroom--the ALJ found, in a well-reasoned analysis, that Student was receiving educational benefit.  Specifically, academics were a strength for Student, and his only academic instruction was received in the classroom setting through general education teaching techniques.  The ALJ found that, although needing frequent prompts, redirection, and removal from the classroom, the weight of the evidence showed that Student was absorbing the material and was capable of mastering grade-level work in the kindergarten classroom.  Student's report cards showed that he was consistently meeting or exceeding grade level expectations, and the evidence revealed that the only source of this learning was the classroom instruction provided by Ms. Albert in the classroom setting.

Ms. Nilsson, full inclusion specialist, testified that she was concerned that if Student was not challenged academically in language arts and math, it could lead to frustration. [4AT:8-17.] After observing Student in class, Ms. Nilsson noted that he wrote a detailed sentence, knew sounds/names/letters/decoding, and knew numbers. [4AR:74:635.] A District Annual Goals report reflecting a progress report date of 11/13 reflects that Student was making good progress in academic/pre-academic reading, some progress in writing sentences and following classroom instructions, and substantial progress in pre-academic/academic math skills. [5AR:101:782-783.] One of several positive comments written on the progress report states: "[Student] was able to read the 10 word list with minimal prompting within 2 minutes, achieving 100%.  This is a great improvement in speed!" [<u>Id.</u>]  Ms. Albert prepared Student's progress reports.

While the District argues that part of Student's academic progress is due to the fact that he repeated kindergarten, it appears from the record however, that this is not entirely accurate.  Student attended only one semester of kindergarten in a special education kindergarten class, and was not exposed to a general education curriculum. [2AR:29:251; 5AT:123:20-124:14.]

Also without support in the record is the District's contention that the testimony of

Student's kindergarten teacher, Ms. Albert, was misconstrued by the ALJ and actually supports a finding that Student was not gaining academic benefit from her class.  The court credits the ALJ's determination of the facts on this issue because her analysis is thorough and careful.  The District is correct that Ms. Albert testified that Student did not make much progress in her class, although she did not test Student's skills at the end of the school year, and never expressed concerns about Student's academic progress to Parents.  Ms. Albert's testimony contradicted her progress reports, and according to the ALJ, she gave confused testimony to explain the contradiction.  Therefore, the ALJ gave her testimony less weight than the written progress reports. [5AR:105:799.] Further, Ms. Albert lacked familiarity with Student's IEP, and disregarded skills displayed by Student when he was prompted, despite the fact that prompting was an allowed part of his IEP. [Id.]

    As to the second Rachel H. factor–whether Student obtained non-academic benefit from a general education placement–the ALJ found that the evidence showed that "Student had made significant progress on his behavioral goals, including being more compliant, following instructions, and reducing vocalizations, tantrums, and self-injury." [5AR:105:822.] This conclusion is supported by a preponderance of the record evidence. Review of the Center for Autism and Related Disorders ("CARD") IEP Progress Report and Progress on Functional and Adaptive Goals reports indicate that Student was making substantial progress on goals including spontaneous requesting and commenting, direction following, planning and organizing, following peers' instructions, inhibition of inappropriate responses, and toileting skills. [3AR:62:545-550; 4AR:64:556-564.] Ms. Bulkin also testified that based on her classroom observation of Student and review of CARD reports, Student was meeting behavioral goals.  Ms. Bulkin opined that a placement with typically developing peers, rather than an SDC, was more appropriate for Student because he had academic strengths in language arts and math, and that the social skills he needed to learn required peers who could model behavior and had the language for reciprocal conversations.  The ALJ gave Ms. Bulkin's testimony great weight.

[5AR:105:802-803.] Ms. Albert testified that Student's behaviors increased from January to June, 2012. [5AR:105:799.] This evidence was contradicted by the CARD behavior progress reports and Ms. Bulkin's observations.  The ALJ gave Ms. Albert's opinion less weight than the CARD reports and Ms. Bulkin's opinion.  In the context of the evidence in the record, the court finds the ALJ's determination appropriate.

As to the third <u>Rachel H.</u> factor – Student's effect on the general education classroom–the ALJ found that even though "Student's behaviors had an effect on the teacher and the general education students, Ms. Albert was able to conduct her classes, even with Student's interruptions and disruptions."  [5AR:105:823.] As mentioned above, Ms. Bulkin's testimony and the CARD progress reports indicated that Student's disruptive behaviors had decreased substantially during the school year.  Further, Ms. Nilsson noted that Student's kindergarten classmates initiated social contact with Student, who responded with prompting. [5AR:105:802.] Ms. Bulkin testified that she saw no evidence that any of Student's classmates were afraid of him. [5AT:80:10-17.] Although there were several biting incidents, two involving substitute ABA aides, and two involving students, those incidents appear to have been isolated, with no further biting incidents in the 2011-2012 school year.  Moreover, despite the biting incidents, Ms. Albert testified that the students in her classroom were "not really" afraid of Student. [5AT:80:10-17.]

The ALJ further noted that related to the third <u>Rachel H.</u> factor is the evidence that the District administration and staff were not supportive of the general education teachers in addressing Student's behaviors in the classroom.  The school's principal intentionally rotated full inclusion students through different classrooms to ensure that no teacher had an inclusion student for two years in a row, thereby ensuring that the teachers would have little or stale experience working with inclusion students.  In addition, the general education teachers, Ms. Albert and Ms. Cummins, had not received any training in the education of disabled students in the classroom.  The ALJ concluded, "District cannot place Student in a more restrictive setting to compensate for the lack of sufficient

supports for the teacher in the general education classroom.  The IDEA mandates inclusion of disabled children to the maximum extent appropriate, and District cannot disregard that obligation because it is difficult, inconvenient, or unpopular." [5AR:105:824.][4]

With respect to the fourth <u>Rachel H.</u> factor–the cost of full inclusion–the District does not address this factor.  As noted by the ALJ, the District offered exactly the same level of support in the SDC setting as in the general education classroom setting. [<u>See</u> 5AR:105:824.]

Balancing the foregoing factors, it is clear that the District did not offer Student a FAPE in the LRE.  The ALJ's conclusion to this effect is deserving of due weight because it is careful and thorough, and is supported by a preponderance of the evidence in the administrative record. Therefore, the OAH decision is affirmed as to the first issue.

**B.   THE ALJ DID NOT ERR BY REFUSING TO ISSUE AN ADVISORY OPINION**

The District next contends that the ALJ improperly refused to rule on whether the District was required to contract with the non-public agency ("NPA") who was serving Student at the time of the IEP to provide the behavioral services specified in the IEP. [District Opening Brief at 16-17.]   Because there is no record evidence that the District sought to change Student's provider of behavioral services, there is no controversy ripe for resolution before the court.

The ALJ found that since District did not offer Student a FAPE in the May 3, 2012 IEP, the issue of whether District must utilize the provider of Parent's choice was moot. Further, the ALJ found that there was no evidence presented that this issue was raised at

---

[4]  A final factor relevant to the effect of Student's inclusion in the general education classroom is that, as Student's counsel eloquently states, "[t]he lessons of patience, tolerance, and compassion learned by Student's classmates deserve every bit as much consideration as does any claimed negative effect of Student's presence." [Student's Opp. at 14.]

1    the May 3, 2012 IEP team meeting, or that the District had sought to make a change.

2    [5AR:105:825.] Accordingly, the ALJ concluded that the District sought an advisory

3    opinion and declined to issue such an opinion. [5AR:105:826.]

4        In the May 3, 2012 IEP, the District offered Student occupational therapy and

5    applied behavior analysis ("ABA") services provided by an NPA. [See 5AR:105:579-

6    580.]   The NPA that had been working with Student was CARD, and their Proposed

7    Goals were included in the IEP. [5AR:105:578.] There is no indication that the District

8    sought to change providers at or before the May 3, 2012 IEP team meeting.

9        "[R]ipeness is peculiarly a question of timing, designed to 'prevent the courts,

10   through avoidance of premature adjudication, from entangling themselves in abstract

11   disagreements.'" Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th

12   Cir. 2000)(quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148, 87 S. Ct. 1507, 18 L. Ed.

13   2d 681 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 97 S. Ct.

14   980, 51 L. Ed. 2d 192 (1977))(internal quotation marks omitted).   "Our role is neither to

15   issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live

16   cases or controversies consistent with the powers granted the judiciary in Article III of

17   the Constitution."   Id.

18       The ALJ's decision not to rule on a hypothetical issue regarding the application of

19   the IDEA is supported by a preponderance of the evidence in the record, and as a matter

20   of law.  Therefore, the OAH decision is affirmed on this ground.

21   **C.    A PREPONDERANCE OF THE EVIDENCE SUPPORTS THE ALJ'S**

22   **AWARD OF COMPENSATORY EDUCATION SERVICES TO STUDENT**

23       Finally, the District contends that there were no "egregious circumstances" in this

24   case to warrant the award of compensatory education services. [District Opening Brief at

25   18-19.] Review of the applicable case law however reveals that, contrary to the District's

26   assertions, there is no "egregious circumstances" requirement for the award of

27   compensatory education services. Furthermore, the ALJ's award of compensatory

28   education services is supported by a preponderance of evidence in the administrative

1  record, and therefore is affirmed.

2          **a.    ALJ Findings:**

3      The ALJ ordered that Student's placement be in a general education classroom at

4  Lindstrom, his home school, as per the May 3, 2012 IEP, and to include the ten-week

5  2013-2013 extended school year ("ESY").  The ALJ further ordered that Student's 40-

6  hours per week of one-on-one ABA behavior intervention services would be provided in

7  a classroom daily for a full regular school day through the remainder of the 2012-2013

8  school year and the ten-week 2012-2013 ESY.  Any remaining service hours not used to

9  support Student would be provided at the Student's home after school. [5AR:105:836.]

10          **b.    Applicable Law:**

11      Compensatory education is an equitable remedy that attempts to account for the

12  educational deficit caused by a deprivation of educational services that a student should

13  have received in the first place.  R.P. ex rel. C.P. v. Prescott Unified Sch. Dist., 631 F.3d

14  1117, 1125 (9th Cir. 2011).  It seeks to "place disabled children in the same position they

15  would have occupied but for the school district's violation of IDEA." Id. (quoting Reid

16  ex rel. Reid v. Dist. of Columbia, 401 F.3d 516, 518 (D. C. Cir. 2005)).  Courts and

17  hearings officers may award compensatory educational services at their discretion, often

18  in the form of prospective injunctive relief.  Reid ex rel. Reid, 401 F.3d at 523.

19      The Ninth Circuit Court of Appeals has held that when a FAPE has been denied,

20  "it may be a rare case when compensatory education is not appropriate." Parents of

21  Student W. v. Puyallup Sch. Dist. No.3, 31 F.3d 1489, 1497 (9th Cir. 1994).  However,

22  the inquiry as to an appropriate compensatory education remedy must be fact-specific and

23  reasonably calculated to provide the educational benefits that would have accrued from

24  special education services that should have been provided to the child in the first place.

25  Reid ex rel. Reid, 31 F.3d at 524.  An appropriate compensatory education award must be

26  designed to ensure that a student is appropriately educated within the meaning of the

27  IDEA.  Park ex rel. Park v. Anaheim Union High Sch. Dist., 464 F.3d 1025, 1033 (9th

28  Cir. 2006.)  There is no need to provide a day-for-day compensation for time missed.  Id.

Aside from the fact that the District relies on authorities that are outdated (citing cases from 1986, 1988, and 1995) and not from the Ninth Circuit, those authorities do not state an "egregious circumstances" requirement as claimed by the District.  First, the District cites to Burr v. Ambach, 863 F.2d 1071, 1078 (2nd Cir. 1988), cert. granted, judgment vacated and remanded, 492 U.S. 902, 109 S. Ct. 3209, 106 L. Ed. 2d 560, reaff'd on recons., 888 F.2d 258 (1989).  In that case however, there was no statement of an egregious circumstances requirement.  On the contrary, the Second Circuit stated that a district court may award such relief as the court determines is appropriate.  Burr, 863 F.3d at 1078.  In Burr, the student had been deprived a FAPE from the age of three to twenty-one, and therefore, the court  awarded compensatory education services to remedy that deprivation.  Burr, 863 F.2d at 1078.

Next, the District cites Miener By and Through Miener v. State of Mo., 800 F.2d 749 (8th Cir. 1986).  In Miener, the Eighth Circuit held that "the plaintiff is entitled to recover compensatory educational services if she prevails on her claim that the defendants denied her a free appropriate education in violation of the EHA [Education of the Handicapped Act, a precursor to the IDEA]."  Miener, 800 F.2d at 754.  The Eighth Circuit concluded that the plaintiff had not stated viable claims under the Rehabilitation Act or § 1983, but that she could, if successful on her claim of denial of a FAPE under the EHA, recover compensatory education damages.  The court remanded the case to the district court for further proceedings consistent with its opinion.

The District's final case in support of its compensatory education argument is Carlisle Area School v. Scott P., 62 F.3d 520 (3rd Cir. 1995).  This case also does not support the proposition for which the District cites it.  In Carlisle, the Third Circuit recognized that Congress intended compensatory education services as a remedy for deprivations of the right to a free appropriate public education.  Carlisle, 62 F.3d at 536.  Noting that it had held that compensatory education was "available to respond to situations where a school district flagrantly fails to comply with the requirements of IDEA," it also noted in the same paragraph that the circuit had "explicitly reserved the

1    question whether a court could order compensatory education for periods when a district

2    attempts in good faith to develop an appropriate placement." <u>Id.</u>   The Third Circuit

3    surveyed cases from other circuits requiring a higher degree of intent by the district to

4    justify an award of compensatory education services.  In the end, the court concluded that

5    because the facts of that particular case did not approach the more culpable conduct

6    described in some of the cases cited, it need not decide whether to adopt their approach,

7    nor did it need to "precisely define the standard except to note that it is necessary, but not

8    sufficient, to demonstrate that some IEP was actually inappropriate, and that bad faith is

9    not required." <u>Carlisle</u>, 62 F.3d at 537.

10           **c.    Analysis:**

11          The District here bases its challenge of the ALJ's award of compensatory

12   education services on a non-existent requirement that "egregious circumstances" exist to

13   justify the award.  Turning to applicable, recent Ninth Circuit case law, it is clear that no

14   such requirement exists in this Circuit.  <u>See</u> <u>Prescott</u>, 631 F.3d at 1125; <u>Park</u>, 464 F.3d at

15   1033; <u>Puyallup</u>, 31 F.3d at 1497.  "[T]he IDEA Offers compensatory education as a

16   remedy for the harm a student suffers while denied a FAPE." <u>Prescott</u>, 631 F.3d at 1125

17   (<u>citing</u> <u>Puyallup</u>, 31 F.3d at 1496-97).

18          After a lengthy, detailed, and thoughtful consideration of whether Student was

19   denied a FAPE, the ALJ noted that Student had been making good academic progress in

20   the general education classroom with one-on-one ABA support for attention and

21   redirection. [5AR:105:835.] Describing the harm to Student of being denied a FAPE in

22   the LRE, the ALJ continued as follows:

23          However, by not attending the afternoon classroom periods, Student missed

24          opportunities for reinforcement of language arts concepts learned earlier in the day,

25          which could address his difficulties with reading comprehension, as well as

26          valuable instruction in science, history, and computer skills.  Student was not

27          receiving academic instruction during his in-home program to compensate for

28          missed classroom lessons, and grade level standards become more rigorous as

27

grade levels advance.  Academics are an area of strength for Student, and Student received both academic and social benefit from attending school during core instruction.  However, Student has ongoing difficulty in the important area of content comprehension, and should receive instruction in academics from a credentialed teacher, with reinforcement of concepts throughout the school day, rather than attempting to learn core curriculum from Mother while working on homework in the evening. . . . In light of the significant and persuasive evidence that Student is doing well in the general education setting and requires a full day of instruction in the LRE, attendance at school for a full day is an important component of a FAPE for Student.

[5AR:105:835-836.]

The ALJ's award of compensatory education services is fact-specific and reasonably calculated to compensate Student for suffered deprivations of a FAPE. See 20 U.S.C. § 1415(i)(2)(B)(iii); Park, 464 F.3d at 1033; Reid, 401 F.3d at 524.  Further, the ALJ's order of compensatory education services is supported by a preponderance of the record evidence.  Capistrano, 59 F.3d at 892.  Accordingly, the award of compensatory education services is consistent with IDEA and Ninth Circuit standards, and is affirmed.

\\\

\\\

\\\

## VI.  CONCLUSION

As discussed above, the ALJ's Decision finding denial of a FAPE on both procedural and substantive grounds is supported by a preponderance of the record evidence.  The court gives deference to the ALJ's credibility determinations and conclusions because the Decision reflects a thorough and careful review of the evidence and the applicable law.  In addition, and for the same reasons, the ALJ's refusal to issue an advisory opinion on whether the District would be required to fund a specific NPA is affirmed.  Finally, the ALJ's award of compensatory education services is consistent with IDEA and case law interpreting the Act, as well as being supported by a preponderance of the record evidence.  Based on all of the foregoing, the ALJ's Decision is affirmed.  Accordingly, plaintiff is the prevailing party and is entitled to attorney's fees and costs.

**IT IS SO ORDERED**.

DATED: <u>March 21, 2014</u>

STEPHEN J. HILLMAN
United States Magistrate Judge